Filed 7/31/13  In re C.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E057877 |
| Plaintiff and Respondent, | (Super.Ct.No. J237172) |
| v. | O P I N I O N |
| S.C. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher Marshall, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant S.C.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant C.M.

Jean-Rene Basle, County Counsel, and Adam E. Ebright, Deputy County Counsel, for Plaintiff and Respondent.

## I. INTRODUCTION

Defendants and appellants C.M. (Mother) and S.C. (Father) are the parents of C.C., a girl born in October 2010. They appeal the juvenile court orders terminating their parental rights to C.C. and placing her for adoption, claiming the court erroneously refused to apply the parental benefit exception to the statutory preference for adoption and select long-term guardianship over adoption as C.C.'s permanent plan. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(b)(i).)[1] We find no error and affirm.

## II. BACKGROUND

C.C. is the youngest of Mother's three children from different fathers and Father's only child. In January 2011, when she was three months old, C.C. was taken into protective custody based on a referral alleging she was being severely neglected. She was found "extremely hungry" and below the 5th percentile for height, weight, and head circumference.

Both parents had difficulty understanding C.C.'s needs. Numerous times they had taken C.C. to the emergency room complaining she would not eat, but when hospital staff

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

fed her she would eat without difficulty. In addition, neither parent appeared to understand the importance of keeping C.C.'s medical appointments. C.C. quickly gained weight in her foster home.

Mother was born in 1981 and has mild mental retardation. She was an Inland Regional Center client in January 2011 and was receiving supplemental security income. She also suffered from depression and was not taking her prescribed medication. She had a tendency to blame others for her problems and had much difficulty comprehending questions. She denied having a substance abuse problem, but admitted the fathers of her older children were drug users. Mother and Father lived together and had domestic violence problems.

Father was born in 1984. He took medication for attention deficit/hyperactivity disorder as a child and attended special education classes. When in high school he was arrested for assaulting his stepfather. He was being evaluated for supplemental security income. In January 2011, he was on probation for possessing methamphetamine, but he denied having a substance abuse problem, even though he told a police officer in July 2010 he had been using methamphetamine for some time.

In August 2009, Mother's older children, K.S., then age 10, and A.C., then age two, were removed from Mother's care in Los Angeles County and placed in foster care due to similar allegations of neglect. K.S. suffered from juvenile rheumatoid arthritis, and Mother had not been taking her to her medical appointments or consistently administering her medication. As with C.C., Mother did not appear to understand the

3

importance of keeping K.S.'s medical appointments or seeking appropriate medical care for her.

Between 2007 and 2009, there were multiple referrals of general neglect involving the girls, and Mother twice received voluntary family maintenance services before the girls were placed in foster care. The Los Angeles County case was transferred to San Bernardino County when Mother moved to Upland in October 2010. Both parents were ordered to randomly drug test in the Los Angeles County case.

The parents were awarded reunification services for C.C., but the social worker believed their prognosis for reunification was poor. A June 2011 psychological evaluation concluded neither parent was capable of safely and competently parenting C.C. at that time. Mother suffered a delusional disorder based on her belief that others could read her mind and control her thoughts. Father was "overwhelmed by the extremely demanding parental requirements associated with fathering [C.C.]" The parents were ultimately unable to benefit from their services, which were terminated in August 2012.

Both parents continued to have difficulty processing information, including written instructions, and following through appropriately. For example, both parents stopped drug testing because Mother thought they no longer needed to drug test, but neither parent verified that information with plaintiff and respondent San Bernardino County Children and Family Services (CFS). Each parent then testified positive for methamphetamine in July 2012. They also continued to have domestic violence

4

problems. Mother was also unable to prioritize or plan her schedule, despite a plethora of assistance from numerous service providers, including Inland Regional Center.

By December 2012, C.C. was two years old and had been living with the same foster family since January 2011. Her speech development was slow and she was not yet potty trained, but she had no medical concerns. The foster parents wanted to adopt her. She was very bonded to her foster parents and looked to them for comfort and support. A.B., then age four, was living in the same home, and the foster parents were in the process of adopting A.B. K.S., then age 12, was living in another foster home and did not want to visit her younger sisters.

The foster parents had been supervising the parents' visits with C.C. since January 2011. The parents regularly visited, but it had been difficult for the foster parents and CFS staff to help the parents make their visits "meaningful and purposeful" due to their cognitive and mental health deficits and substance abuse. The visits were "mainly play dates" for C.C. C.C. did not rely on either parent for comfort or guidance during the visits. The social worker did not believe termination of parental rights would be detrimental to C.C.

Neither parent was present at the section 366.26 hearing in January 2013. They called and said they would be late, but did not arrive by the time the matter was called for hearing at 2:36 p.m. The court admitted the December 19, 2012, section 366.26 report into evidence, but neither parent offered any affirmative evidence and no witnesses were called.

5

Father's counsel asked the court to consider guardianship over adoption because he had "never seen a guy that's more devoted to the child than [Father]." Father's counsel submitted that Father was, "from every measure . . . a devoted father to his child and . . . would be beneficial in the child's life . . . ." The court found C.C. was adoptable, terminated parental rights, and selected adoption as her permanent plan. Without discussing the parental benefit exception specifically, the court noted that no exceptions to the adoption preference applied. The court also noted that the parents had relapsed into drug use over the previous several months and had not been regularly visiting C.C.

### III.  DISCUSSION

The parents each claim the juvenile court abused its discretion in refusing to apply the parental benefit exception at the section 366.26 hearing. We find no error.

A.  *Applicable Law*

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

Adoption involves terminating the legal rights of the child's natural parents, but guardianship and long-term foster care leave parental rights intact. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 574.) "Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the

6

Legislature had in mind for the dependent child." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344.)

To avoid adoption and termination of parental rights at a section 366.26 hearing, a parent has the burden of showing one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469; *In re Celine R.* (2003) 31 Cal.4th 45, 53.) These exceptions "merely permit the court, in *exceptional circumstances* (*In re Jasmine D.* [(2000) 78 Cal.App.4th 1339,] 1348-1349), to choose an option other than the norm, which remains adoption." (*In re Celine R., supra,* at p. 53.)

The parental benefit exception applies when two conditions are shown: the parent has "maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i), italics added; *In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) In order to show that the child would benefit from continuing the relationship with the parent, the parent "must do more than demonstrate . . . an emotional bond with the child"; the parent "must show that he or she occupies a 'parental role' in the child's life." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)

The parent must also show that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing

7

the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

"'The balancing of competing considerations must be performed on a case-by-case basis and take into account many variables, including the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs. [Citation.] When the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent/child relationship, the court should order adoption.' [Citation.]" (*In re Jasmine D., supra,* 78 Cal.App.4th at pp. 1349-1350.) In other words, "[i]f severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1235.)

B. *Standard of Review*

Appellate courts have traditionally applied either the substantial evidence test or the abuse of discretion test in considering challenges to juvenile court determinations that the parental benefit exception did not apply. (*In re Scott B., supra,* 188 Cal.App.4th at p. 469.) There is little, if any, practical difference between the two. (*Ibid.*)

As explained in *In re Jasmine D.*: "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did.' . . ."' [Citations.]" (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.)[2]

C. *Analysis/Mother's Claims*

Despite the court's comment at the section 366.26 hearing that the parents had recently stopped visiting C.C., the parties agree the parents maintained regular visitation and contact with C.C. throughout the proceedings. The critical question is whether the juvenile court abused its discretion in implicitly concluding that the parental benefit exception did not apply because C.C. would benefit more from adoption than from maintaining any relationship with the parents.

Mother argues she "made tremendous efforts to overcome her limitations and gain sufficient parenting skills to care for her daughter." Thus she argues it would be "detrimental to deprive [C.C.] of a loving, sincere parent who never intentionally harmed her in any way." This argument is unavailing because it does not address whether C.C.

---

[2] More recently, courts have applied a composite standard of review, recognizing that the parental benefit exception entails both factual and discretionary determinations. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [substantial evidence standard applies to factual determination whether a beneficial relationship exists, and abuse of discretion standard applies to discretionary determination whether there is a compelling reason to apply the exception]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [same].) Here, however, the facts are essentially undisputed and the question is whether the court abused its discretion in determining that the parental benefit exception did not apply.

would benefit more from being adopted than from continuing her relationship with Mother or Father.

Indeed, there was no evidence that C.C. would benefit more from continuing her relationship with either parent than from being adopted. Nor was there any evidence that terminating parental rights would be detrimental to C.C. C.C. was only two years old at the time of the section 366.26 hearing, and was removed from the parents' custody when she was only three months old. Neither parent forged a parental relationship with her during their many supervised, weekly visits over the course of the next two years. C.C. did not look to either parent for comfort or guidance during visits, and did not share an emotional attachment with either parent. There was therefore no compelling reason for the court to apply the parental benefit exception and choose a less restrictive form of placement over adoption, such as long-term guardianship.

Mother points out that *In re Jose C.* (2010) 188 Cal.App.4th 147 involved a mother and son who were both severely developmentally delayed. The juvenile court placed the son for adoption even though his foster mother believed it was important for him to maintain a relationship with his mother. (*Id*. at p. 154.) *In re Jose C.* does not assist Mother's argument because the appellate court did not disturb the court's adoptability finding or permanent placement, and is distinguishable in any event because the son was eight years old and had a long-standing, albeit "peer-like" relationship with his mother. (*Id.* at p. 152.) C.C. was only two years old, had no significant emotional

10

attachment with either parent, and would not suffer detriment if parental rights were terminated.

Lastly, Mother argues the court erred in failing to consider long-term guardianship over adoption, citing *In re Brandon C.* (1999) 71 Cal.App.4th 1530. Not so. *In re Brandon C.* is inapposite because the juvenile court there found that the parental benefit exception applied based on the children's emotional attachment with their mother. (*Id*. at p. 1534.) Father's counsel specifically asked the court to consider guardianship over adoption and apply the parental benefit exception based on Father's dedication to C.C. Again, however, C.C. did not have a significant emotional attachment with either parent, and the court reasonably determined she would benefit more from adoption than from continuing a relationship with either parent. The court was thus required to select adoption over long-term guardianship as C.C.'s permanent plan. (§ 366.26, subd. (c)(1).)

D. *Analysis/Father's Arguments*

Father claims the orders terminating parental rights and placing C.C. for adoption must be reversed because the juvenile court confused the case with the one just before it, and terminated parental rights based on its misunderstanding that the parents did not maintain regular visitation with C.C. At the section 366.26 hearing, the court announced it was "terminating parental rights and setting a hearing to determine a permanent plan of adoption or guardianship. . . ." At that point, Father's counsel reminded the court that this *was* the section 366.26 hearing and the court was to determine a permanent plan for C.C. The court said: " Excuse me. I was thinking of the last—yes. Never mind. Just

11

thinking of the last case I just had." The court then noted that "in the last few months the parents have relapsed into substance abuse and they have also not been visiting regularly . . . ."

On this basis, Father argues the court mistakenly believed the parents had not maintained regular visitation and contact with C.C., and the factual error is prejudicial. We disagree there was any prejudice. To be sure, the evidence showed, and the parties agree, that both parents maintained regular visitation and contact with C.C. But like Mother, Father does not explain how C.C. would benefit more from maintaining her relationship with either parent than she would benefit from being adopted. For this reason, the court's mistaken suggestion or finding that the parents failed to maintain regular contact with C.C. was not prejudicial under any standard. Finally, the court's comments as a whole show it knew it was dealing with C.C.'s case.

## IV. DISPOSITION

The orders terminating parental rights and placing C.C. for adoption are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

McKINSTER
Acting P. J.

RICHLI
J.

12